The United States overfills the Federal Service is now the witness in session. God save the United States and the Federal Court. The first case for argument is Media Rights Technologies v. Capital One Financial Corp. Case number 141218. Mr. Pickard, do you want to reserve three minutes for rebuttal? Yes, Your Honor. Okay. You may proceed. May it please the Court, I'd like to focus my time today on three reversible errors that the trial court committed. First, the trial court erred in finding the 033 patents compliance mechanism was a means plus function limitation. Second, even if the compliance mechanism was a means plus function limitation, the court still erred in finding the specification failed to disclose corresponding structure for the compliance mechanism's function. And finally, the trial court erred in finding that the custom media device of the 033 patent was indefinite. Turning to the compliance mechanism, there's no dispute in this case that the compliance mechanism as recited is not in the means plus function form and therefore enjoys a strong presumption that it is not a means plus function limitation. To overcome that limitation, it must be shown that the claim read in light of the specification does not recite structure. The trial court's basic error here was that it did not consult the specification when deciding that the compliance mechanism failed to recite structure. In fact, the trial court's memorandum of opinion makes that clear. The judge concluded that the claims themselves do not recite structure. What's the distinction between the amount of structure that needs to be clearly disclosed in the specification to get past the application of 112.6 and the amount of structure that's necessary assuming you're looking at a 112.6? Sure. I think that's a very good question. You only ask good questions. I agree. On the first question, the analysis focuses on does the claim term connote structure based on what's in the specification. The second part of the analysis, if you find it's a 112.6 term because the specification is essentially devoid of structure, you look to the functions of that claim term and then decide where in the specification are the corresponding structures linked to those functions, if you will. I guess that's my point. If you're saying that we have to find that the specification is devoid of structure in order for 112.6 to apply, then what structures are we looking for if we assume 112.6? Right. I think if we're looking to the structure in the patent, we're not limited to the structures that are correlated to the claimed functions of the compliance mechanism. In our brief, we've pointed to four categories of structure that the specification describes the compliance mechanism. Let's talk about that because it seems like the structure that you're pointing to tends to be more related to the function and to what it's connected to rather than what it actually does. Your Honor, some of the structure we point to does relate to the functions of the compliance mechanism. This court in the Inventio case also pointed to the functions. In that case, it was the modernizing device. It looked at some of the functions of the modernizing device to decide their structure. For example, in the Inventio case, the modernizing device would run a computer-programmed product. The court there said, at least in part, that connotes structure because that computer-programmed product invokes an algorithm. The technology there was how you optimize elevator calls. You can look to functions, at least according to this court's cases. Indeed, if you find it was a means plus function limitation, this court has said things like algorithms can be structured. When you're dealing with software, we submit that things like functions can be structured. We have more than that, however. Like Inventio, calling out what the device or mechanism is coupled to is one indicia of structure. Our patent does that. Claim one specifies that the compliance mechanism is coupled to the client system as well as the custom media device. But even a structure that is claimed in undeniable means plus function terms is nearly always coupled to something else. The fact that, full stop, that doesn't even begin to tell you without further identification of what the coupling is, what the structure is. Your Honor, I think that if all we had was a simple coupling, that would not be enough. I do think, based on what we have in the Inventio case, that it is some indicia of disclosure of structure for the compliance mechanism. If you look through the rest of the description, the coupling is specifically called out and described. For instance, in the figure 5B and 5C, the coupling there is shown how that actually works. The compliance mechanism can open and close software switches in the custom media device. There is another coupling to the playback application and those embodiments. And the patent describes that what is going on there is that the system is communicating usage restrictions for the media to the compliance mechanism. And then also figure 3 of the patent tells you... with respect to the things it is coupled to. That doesn't, it seems to me at least, yet begin to suggest what structure is carrying out those functions. I submit that in a software patent like this, consistent with the Inventio holding, calling out things like the processes that the term in question performs, that can be indicative of structure. Describing how the compliance mechanism interacts with the components to which it is connected. That also can be a description of structure. And we also have figure 3 which calls out or describes the components that can make up the compliance mechanism. Figure 3, doesn't the patent describe figure 3 itself as a description of functions? Some of those, yes. Yes, but I think in the software world we submit that you are always going to have some functional... Function is going to be part of what happens in software because they are in their essence instructions. But when you describe the compliance mechanism with these different components, because it is software that would connote to a skilled artisan structure. Are you going to talk about the custom media device limitation also? Yes, Your Honor. Because I assume that if we agree with the trial judge on either of those propositions, that either the custom media device is indefinite or the compliance mechanism, however read, is indefinite. Either one, you lose. Is that correct? That's right. Each of those claim terms appear in each of the claims. So if either is indefinite, the entire patent... So speak for a few minutes about the custom media device issue because it's not that different, is it? I do think it is different. We do not have the means plus function issue with the custom media device. We could come back to that, but go ahead. He treated that as a straightforward utility claim element in the patent. Correct. We submit that there are three analytical errors in the judge's decision that the custom media device was indefinite. First, the court expressed some confusion whether the claim term was software or hardware. I find nothing in the patent that tells me one way or the other on that issue. Do you find something? Yes, Your Honor. I think if you look to column five of the patent, lines 18 to 23, the language there reads, a client's computer system, e.g. 210, can be configured to utilize a custom media device application, e.g. custom media device 310. And I think that's significant because... I'm sorry, what are you reading from? That is column five, lines 18 to 23, I believe. The language there, it describes a custom media device application, which I think... Wait a minute, I'm having trouble finding you. I can't find what you're saying. I'll get an update on that. What column are you in? I have column five down in my notes here. This is in our brief, and the quote that my colleague will give me, I apologize, it calls out custom media device application. I think we can agree that that's software. And as an example of the kind of software that can be... It says can be. Read your quote again. Right, the client system can be configured to utilize a custom media device application. Which means it could be software, but it doesn't need to be. That's true. It may be configured without it, but when it calls out the custom media device, the actual claim term, it gives that as an example of a custom media device application. Application, which is software. Yes. But it says can be, which means it doesn't have to be, right? The can be modifies what the client computer system can be. So in this example, the client computer system can be configured to have a custom media device application. And among the things that can be an application are the custom media devices, what that says. But be that as it may, the court and Capital One haven't explained why that's material here. At the end of the day, when you have a software element, there is always going to be underlying hardware. And the mix between the two is an implementation detail. Second. I guess I'm confused. What does that mean in terms of what the phrase means? Yeah, so the claims are drawn. In the software, there's hardware, of course. You've got a computer. So you're not just claiming a computer, though, right? We're not just claiming a computer here, Your Honor. The claims are directed or claimed at the software level. But inherently, there's always going to be an underlying hardware that runs that software. And I think that it has not been shown here why this confusion, if there were any, which we don't believe there is, would make the claim unreasonably uncertain. Well, now I'm uncertain. So are you saying that it is software or it is hardware? It is software, Your Honor. Okay, so if it is software, then what about that software makes it either a device or custom? I'll pick up the custom. So I think starting with what was proposed as the construction of this term by Media Rights Below, it was proposed the custom media device was an application or driver specific to the particular media content being presented. And if you put that in the context of the terms, one sees that there's several ways in which the custom media device is customized. It's coupled to the compliance mechanism. That becomes important later in the claim when you see that the function of the custom media device is to selectively restrict media output. That's really the essence of this invention. What is the custom media device? It is software. What does it look like? Well, it's software. It doesn't look like anything. It's not a device. It's software. It is software. That's right. So the label is wrong or your definition is wrong. Which is it? I don't concede that it's an either or here, Your Honor. I think our definition is correct, and I think that device has enough flexibility to connote hardware or software. In this case, we've described it and claimed it as software. I see that I'm into my rebuttal time. I'm happy to answer more questions. Can I ask you just one question, and this is back to the compliance mechanism? Assume, for purposes of this question, that this is a 112F claim. What in the spec gives a structure, and I will include an algorithm here, for the diverting pathways function? Forget the other two or three functions. I don't get it out of that little program at the bottom of column 11, top of column 12. Your Honor, I think you were talking about the source code that's at column 11. I think the patent clearly calls out that that source code can perform that function. I know you say that. I don't get it from the source code. Isn't the evidence, the state of the evidence on this that the other side had an expert said, all that source code does is spit out an error message, it doesn't actually divert the pathway, and you don't have contrary evidence? I'd like to address that. I do think this is an area where the court needs expert witness testimony to determine what that source code discloses at an algorithmic level. The evidence that I believe Your Honor is referring to is the opinion of Dr. Chatterjee, where he says that essentially that the source code wouldn't compile, and that it invokes the starting point of the code. I think he also says that all it does is say you have an error if something doesn't work. It doesn't actually produce a change in pathways. I think that's not a fair reading of Chatterjee. He says that it doesn't teach a particular function. He doesn't wrestle with the issue, is there an algorithm there? Part of that stems from the problem that when Mr. Chatterjee or Dr. Chatterjee was giving that opinion, he was giving it in the context of the custom media device, not the compliance mechanism. Moreover, the trial court did not consider or credit that evidence when it decided that the specification lacked structure corresponding to that function. So that doesn't enjoy a clear error review under TEVA. The trial court simply didn't consider or credit that testimony. Thank you. All right, thank you. We'll give your three minutes back, and we'll give your friend on the other side, Mr. Engle, is that correct? Yes, ma'am. Another three minutes. Thank you, Your Honor. Good morning. Robert Engle for Capital One. You don't have to use the extra three minutes. Your Honor, I'll use as much time as you would like, but no more than that. Your Honor, the district court decision below should be affirmed because the patent, the 033 patent here, is an impenetrable matter, as you probably determined by reviewing it, that neither meets the patent eligibility requirements under 35 U.S.C. Section 101, nor the definiteness requirements under 35 U.S.C. Section 112-2. You want us to jump from the morass of indefiniteness into the clean pool of 101 law? Well, Your Honor, this patent does have a number of problems. If you look at the claim language, I mean, one of the reasons that the patent What did the trial court say about your 101 argument? The trial court did not reach it, Your Honor. Neither can we. Your Honor, I respectfully disagree. The court can, in fact, reach it. As this court held in Glaxo v. Torfarm, a 1998 case, which I don't believe medded into our briefs, but it's at 153 F. 3rd, 1366. Capital One has the right to defend the judgment below, and this court has the right to affirm the judgment below on any ground supported by the law or the record. Here, the law and the records both support reaching that issue. But the judgment below was that the patent was invalid under 112-2, right? Yes, Your Honor. Not under 101. You would like us to remand it to the trial court to do a 101 analysis? No, Your Honor. I'd like you to affirm. You want us to do an initial 101 analysis without ever having presented it to the trial court. Can you be serious? Your Honor, the decision of this court in Tempo Lighting v. Tivoli just last year, which was 742 F. 3rd, 973, prevented us from filing a cross-appeal on this issue. The court held that we can't expand the relief granted below. But you can, as an initial matter, reach that issue under the Glaxo v. Torfarm case. But I understand if you don't want to reach it, so I will move on. Picking up where my friend left off, talking about the custom media device. Yes, the custom media device. First, let's go to a legal issue. Yes, ma'am. What is your take on Inventio? What's the distinction from this case to Inventio? In the Inventio case, well, I'll have to remind myself of Inventio. Okay, Inventio is the case about 112.6. Okay, right, sorry. It's a modernizing device that we can control. Yes, exactly. Yes, Your Honor. Yes, Your Honor. Well, Your Honor, I asked a very good question of my friend earlier today, which is where is that line drawn between the amount of specificity and specification needed to find and overcome the presumption that 112.6 doesn't apply,  and whether there's sufficient structure to support that the claim term doesn't fail to meet the indefiniteness challenge. Here, I think it's clear, and I think the district court should be affirmed, that 112.6 did apply. As this court held in Apple v. Motorola, the presumption can be overcome if a claim merely recites a function without reciting structure to form that function. That's precisely what we have here. The compliance mechanism, as set forth in the claims, really just performs several functions, controlling, diverting, and monitoring of data output pathways. Help me with one thing that I'm a little unclear about. Yes, Your Honor. Why does it matter whether the trial court found compliance mechanism A112.6? Wouldn't the problem be exactly the same if the trial court had simply said compliance mechanism is indefinite because it does not contain, and there's nothing in the written description that explains what those words mean? Yes, Your Honor, I agree with that. Frankly, the issue of 112.6 came up in the context of us struggling, having reviewed the patent many, many times, to make sense of what this term meant and reacting to MRT's proposed construction. Well, in fact, though, your argument is much more difficult if it's not a 112.6, isn't it? I mean, they do point to at least arguably some structures that would perform some of the functions, but if you're under 112.6, they have to have a structure that would perform every one of the disclosed functions. Well, Your Honor, that's a good question, and I believe that the analysis would really be the same because MRT has taken its own difficult positions in this case, trying to expand the scope of the patent to reach, I mean, if you look at the patent, it's directed at the relatively narrow problem of Napster, the easy copying and proliferation of copyrighted audio and video files, what they wanted to read on virtually every way in which Capital One's websites deliver information or data to its customers. And to do that, they have to read compliance mechanism broadly. And so not only have they construed it purely functionally as actions or steps on a computer to enforce data restrictions, they have distinguished it from what disclosure there is in the specification. The specification talks about a copyright compliance mechanism, never discusses a compliance mechanism as being distinct from that. And yet MRT contends that they are distinct, that the compliance mechanism is a category of things that perform the functions as claimed, of which the copyright compliance mechanism is merely an example. And if you take them at their word for that, that means to understand what a compliance mechanism is, first you have to understand what the copyright compliance mechanism is. And you're right, there is some disclosure in the specification about certain components that could be part of the copyright compliance mechanism. But nowhere does the specification tell you which of those components must be part of the copyright compliance mechanism. And in fact, it goes so far as to suggest that there are unnamed components that could be part of the copyright compliance mechanism. Thus, it's essentially an open set. It's not unlike the determination this Court made in the Ivermeet v. Mercedes-Benz case. Now, admittedly, there we were talking about an algorithm, and the specification disclosed a number of factors that went into that algorithm for an alarm limit on sleepiness. Just not the algorithm. I'm sorry? Just not the algorithm. Correct, Your Honor. Ivermeet, in that case, took the position that, well, first of all, the specification did not provide any concrete examples of how these factors work together to create, to reach the alarm limit. And Ivermeet took the position that it could be any combination of those factors that were set forth in the specification, leaving it open-ended. This Court took Ivermeet and his expert at his word on that, said it was actually a binding admission, and pointed out that they were trying to stretch the claim language to meet the Mercedes-Benz product at issue. Likewise here. MRT has taken the broadest possible position as to what the compliance mechanism is, and has even distinguished it from the only disclosure we have, which is the copyright compliance mechanism set forth in the specification. I don't remember, John, compliance mechanism without the word copyright in front of it. Does the spec use that expression? No, Your Honor. It does not. Nowhere in the written description. In the summary of the invention, there's a repeat, essentially it's a sentence repeat of what's in the claims. So it shows up there, but there's no discussion of them, and certainly no discussion of them together, so that you can figure out how the copyright compliance mechanism is different from the compliance mechanism. But isn't what you're arguing more a question of claim construction than it is of indefiniteness? In other words, if it should be limited to copyright compliance mechanism, then that doesn't mean that it's not definite, if you can determine what copyright compliance mechanism is, right? In other words, it's a two-step process. If the only compliance mechanism disclosed is the copyright compliance mechanism and the copyright compliance mechanism is definite enough, has enough structure to determine what that is, that's a different issue. That means that their claim construction is too broad, but the claim itself is not indefinite. Well, Your Honor, it's walking down exactly the path that Capital One walked down before the district court in trying to make sense of this term. It's the heart of the claimed invention. It's the compliance mechanism. It is, in the claims, what does the work in theory. Your argument is that the trial judge is entitled to look at the exact words of the claim without rewriting them in light of the written description. Well, the claim language certainly needs to be read in light of the specification, but here the specification doesn't illuminate what the compliance mechanism is. To the extent there's description, it's of the copyright compliance mechanism, which MRT contends is different than the compliance mechanism. And as you noted in your questions to my friend, largely the description is in a functional nature. But Judge O'Malley's point is if we all read compliance mechanism as meaning copyright compliance mechanism, because that's the only way it's used in the written description, then wouldn't the question be whether copyright compliance mechanism is or is not indefinite on its own terms? Your Honor, that is an interesting question that has not been raised because MRT has disclaimed that position. They have affirmatively throughout the district court and here said that the compliance mechanism is not the copyright compliance mechanism. It is something broader than the copyright compliance mechanism, and they have to be held to that binding admission. So you're saying we can't get there through claim construction? I don't believe so, Your Honor. Though it is a de novo review, so perhaps you can get there. But I don't believe the issue is properly before you because MRT has affirmatively disclaimed that position throughout. Well, as I indicated to you at the beginning, I'm not sure that we have free license to rewrite the arguments that the parties bring to us. I mean, it's not our case. It's your case. Right, Your Honor. I agree with that. All right. So let's just go down this hypothetical road for a second. If we were looking at copyright compliance mechanism 300 as disclosed, what about that is indefinite? What about that would be indefinite? Indefinite. It's indefinite, Your Honor, because first of all, it is described, there are a number of components described with respect to the copyright compliance mechanism in the specification, undoubtedly, and you can point to Figure 3, for example, and it identifies various components. Various functions, Figure 3. Exactly. I mean, we're talking about, as MRT contends, software. We're talking about various types of software, and the way it's described in the specification is all kinds of different pieces of software, codecs, skins, other various pieces of software, could be part of the copyright compliance mechanism. But the specification is clear to state that it could be other combinations, it could be any combination of factors, without identifying any specific factor for function or software that must be part of the copyright compliance mechanism. Thus, it's an open set. It says that certain things could be it, but will provide no definitive boundaries on what that term means, if you see the copyright compliance mechanism. Are you going to talk about the custom media device issue? Absolutely, Your Honor. That's actually an easier issue for you, isn't it? I agree that it is the clearer issue, and I would say easier. Under Section 112.2, of course, the purpose of the definite requirement is to provide public notice of the scope of the claimed invention. Here, the drafter, of course, as this Court has said in a number of instances, is in the best position to avoid ambiguity with respect to the claim scope. Here, the drafter chose a specific term, custom media device. That, as MRT acknowledges, has no plain and ordinary meaning to the person's skill in the art, and in fact, by using the term custom, it suggests that there's something customized about it, something unique about it that sets it apart from a standard media device. Well, I mean, their response to that is that the custom part is that it will respond so that you have an application for video, you have an application for audio, and that that's what's customized about it. Right. That is their response, Your Honor. And they can't point to anything in the specification that clearly says that. They are just weaving together various passages of the specification trying to support that. But even if there were somewhere in the specification, and the primary discussion of the custom media device comes from Column 13, and that's what my friend was talking about earlier, where the specification alternatively talks about a custom media device, a custom media device application, a custom media device driver, and talks about them interchangeably as if they are different components and yet somehow the same. For example, the sentence that my friend read was a custom media device application and then uses as an example the custom media device 310. But as Your Honor spoke to earlier, the term custom media device suggests it's hardware in some fashion. Throughout the specification, whenever there's a description of a device, it's referring to hardware. Here there's nothing, and of course Capital One did submit an expert report that the district court did rely on and cite to, that talked about device connoting hardware, something that's hard. What about the fact that it specifically calls out an application in the specification itself? Your Honor, I believe that just adds to the ambiguity and confusion because it refers to a custom media device application and then says, e.g., custom media device 310. So the custom media device 310 is an example of a custom media device application, but could be other things. We don't know. In addition, it says the custom media device driver, and when you have a driver, and Capital One's expert also spoke to this, when you have a driver, a driver is something that you tend to communicate with hardware. I suppose we could read that. I hadn't thought of it before. Thank you for the explanation. I suppose we could read that as the patentee defining custom media device as also an application, couldn't we? That is the position that MRT has taken, that it's exclusively an application because of that paren, e.g. No, even without saying it's exclusively an application, the patentee may be saying it's both. A device is both a device and an application, and we don't care which it is, says the patentee. The patentee certainly has not clearly stated what it is, or described it in a way that it's easy to figure out what it is. They have avoided the obligation to clearly and definitely disclose to the public what the scope of their invention is. The most telling part of it, of course, is even if we say it's an application, because there's a custom media device application, and custom media device 310 is an example of that. Let's say that. Okay, so it's an application. But it doesn't tell you any more than that. It doesn't tell you what it does, how it does it, and how it's customized, most importantly. Your Honor, the question that led into this, we were asking about their position that the custom media device is specific to the media being played. Well, all media devices, standard media devices, are specific to the media played. A DVD player plays music. A video player plays video. So that in and of itself doesn't make it custom. There must be something else. But I defied MRT to identify anywhere in the specification where it clearly tells you how it's been customized. As we put it on our brief, one of the most telling aspects of it is that MRT's proposed construction, which is that it is a driver or application specific to the media content being played, viewed, or presented, captures standard media devices. So there's no distinction there. There's no way to know whether you have a custom media device or a standard media device. They have simply left customized. Well, if you read the word specific in that claim construction to mean single purpose as opposed to multi-purpose, wouldn't that at least exclude those devices that would play a CD and a DVD, for example? That is possible. MRT certainly has not taken that position. In part, as I discussed earlier, MRT is trying to take a patent directed at the unauthorized recording of media in the context of audio and video files and have it apply to the transfer of information to customers over the Internet. So they haven't taken that, and they've avoided and disclaimed any narrowing of the meaning of these claim terms. Okay. Your time is up. Thank you. Thank you, Robyn. If I may, I'd like to talk about how the custom media device is customized. The proposed construction that MRT set forth below and in this brief here was, as I said earlier, an application or driver specific to the particular media content being presented. What does driver mean in that case? The patent gives examples where the custom media device can emulate a driver, and the driver is essentially software that would allow a piece of hardware to operate or another piece of software. One example given is Total Recorder in the patent, which is a recording functionality in Microsoft operating system. When the custom media device emulates the driver, it's missing some of the native functionality that the Total Recorder would need in order to record. We take that and turn it back to the proposed construction. If you read it in isolation, I do think there's a problem with the construction, but the construction needs to be put into the context of the terms, and that will help illuminate how the custom media device is customized. The proposed construction gets that one piece of it, and that is the inventions are directed to restricted media content, and the patent describes the labeling of this media content in one example, and in another example how the custom media device would be the only device through which this restricted media could pass and be playable. If you place it into the context of the claims, the custom media device has some other important attributes. As I said earlier, it's coupled to the compliance mechanism. Can I just ask you something that I'm probably confused with? In the figure 5B, 5C, essentially the same, let's use 5C, but there are at least two paths by which media can come in on the left through the playback application and get out to the recording application, 502, without passing through the custom media device. The two paths, the northward arrows would be through 548 and 568. You can get to those two things without going through the custom media device. I just want to make sure I understand what you're thinking of. Right at the top, playback. One example is 501 to 503, then up 548 out to 502. The other is playback 501 across down to 504 direct sound, and then up through 568 to the recording application. Both of those are under the control of the compliance mechanism. They can close those two, they don't call them gates I guess, but the 548 and 568, but they both show paths that don't go through the custom media device by which recording can take place. Right, so if the data or the media were on the common pathway, it would be possible for the media to go 501 down to 503 and then return to the recording application and not encounter the custom media device, for example. What's shown here in Figure 5 is we're now on a controlled pathway and the media must go all the way down to the output device before it returns. If you look at 580, that's I think the only place in this figure where it has the two-way arrows, which would indicate that the media in these other boxes must continue on that downward path. I guess the reason that I asked it, and maybe I'm confused about the connection, is that it seemed to me that both in your reply brief, and I think as you were beginning to talk, you were trying to narrow the custom media device to that thing which allows recording, as if that meant that was the exclusive way that a recording could take place. And the two paths that I just described seem to me to be ways that recording can take place without going through that. Okay, I think part of what I meant to communicate was that the custom media device in most environments is a way to prevent unauthorized recording, not to allow it. And what's shown here in Figure 5e, for example, there are several ways to do that. WaveShim Driver 309 is another way to do it. What's customized about the custom media device is that it is able to interact with the CCM300 here, for example, in Figure 5b. The patent in other examples explains that standard media players, that the compliance mechanism couldn't control, you would need to customize them, and it gives the example of the skin. So that's one way to distinguish standard from custom. And finally, my time is... Let me just ask you before you sit down. Your friend on the other side said that you disclaimed the CCM as being consistent or the same as the compliance mechanism. Is that true? I don't think I've used the word disclaimed. Copyright compliance mechanism falls within the scope of compliance mechanism. The patent does mention compliance mechanism in the abstract, for example. So it is your position that compliance mechanism is broader than copyright compliance mechanism? That's right. I think the patent simply describes the broader compliance mechanism through the example of the copyright compliance mechanism. And as is, I think, clear from the specification, copyright is one way that the media could be restricted, but not the only way. It describes that through the example of a copyright restriction. Yes, I mean, the whole first column of your patent says, we're going to tell you a lot of stuff, but you don't necessarily need all this stuff, and we're going to not tell you a lot of stuff, but don't believe that we didn't tell you this stuff. That's the strangest opening to a patent I've ever seen, but I understand your position. Thank you. Thank you.